IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AXIS CONSTRUCTION CORP., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 02-CV-3017 |
| | : | |
| LANDMARK BUILDING SYSTEMS, INC. and DOUGLAS GEORGE, | : | |
| | : | |
| Defendants; | : | |
| | : | |
| and | : | |
| | : | |
| JOHN J. DELANEY, JR., ESQUIRE and FRANCIS X. CLARK, ESQUIRE, | : | |
| | : | |
| Nominal Defendants. | : | |
| | : | |
| LANDMARK BUILDING SYSTEMS, INC., | : | |
| Third-Party Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| HUMMER EQUIPMENT CO., INC., TOWN SUPPLY COMPANY, INC. and PIONEER WINDOWS, INC., | : | |
| | : | |
| Third-Party Defendants. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO LANDMARK BUILDING SYSTEMS, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Axis Construction Corp. ("Axis"), by and through its undersigned attorney, submits this Memorandum of Law in Opposition to Landmark Building Systems, Inc.'s Motion for Summary Judgment.

**I.     INTRODUCTION**

Defendant Landmark Building Systems, Inc. ("Landmark") seeks summary judgment against plaintiff Axis Construction Corp. ("Axis"), based on multiple grounds. First, Landmark incorrectly asserts that Axis lacks capacity to sue in Pennsylvania under the Pennsylvania Business Corporation Law, 15 Pa. C.S.A. § 4122, as a foreign corporation that has not obtained a Certificate of Authority in Pennsylvania. As demonstrated in detail below, Landmark's argument fails because the purchase of personal property (building modules) by a foreign corporation for shipment in interstate commerce out of Pennsylvania is not "doing business" within the meaning of § 4122. Rather, as United States Supreme Court and Third Circuit precedent clearly establish, a state cannot refuse to enforce in its courts contracts concerning interstate or foreign commerce.

Landmark and defendant Doug George next contend that George is insulated from liability for his own personal, active involvement in defrauding Axis with respect to the status of Landmark's payments to its subcontractors on the Plainedge Project, simply because George was acting within the scope of his responsibilities as an officer of Landmark. Of course, defendants' argument is contrary to well-established caselaw in Pennsylvania providing that an agent of a corporation that personally commits a wrongful act may be held liable for the act.

Landmark next requests summary judgment on Axis' fraud claim against Landmark and George based on the apparent contention that no material fact issues exist and Landmark/George are entitled to judgment as a matter of law. Landmark's position lacks merit for several reasons including (1) failure to comply with Fed. R. Civ. P. 56(c) in

asserting unsupported, unverified facts; (2) the Declaration and Deposition of John Buongiorno (Tabs 1 & 2 to Axis' Response to Landmark's Motion), which contain testimony refuting defendants' assertion that Axis "knew" the truth, so could not have relied on defendants' misrepresentations, and (3) the other record evidence cited in this Memorandum which establishes a *prima facie* case of fraud. At best, Landmark and George's denials of falsity, fraudulent intent, justifiable reliance, and damages raise factual issues to be decided by this Court at trial.

Finally, all of Landmark/George's arguments for dismissal of Counts II, III, VI and VII of Axis' Complaint on summary judgment are derivative of its arguments concerning Count I for fraud, and should also be rejected. However, Axis does acknowledge that Counts IV, V and VII of the Complaint have been rendered moot by events transpiring after filing of this action, or are otherwise subsumed within Counts I, II, III and VI. Accordingly, Axis does not oppose dismissal of Counts IV, V and VII of the Complaint as moot.

## II.    ARGUMENT

### A.    Standard of Review of Summary Judgment Motion

Summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with Affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is "genuine" if there is sufficient evidence from which a reasonable jury could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and

identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Under the foregoing standard, Landmark has not met its initial responsibility to "identify those portions of the record that it believes demonstrate the absence of a genuine issue of material fact."  Additionally, as demonstrated below, the record is replete with evidence establishing Axis' entitlement to a recovery on its fraud and contract theories, precluding summary judgment in favor of Landmark.

**B.     Axis May Maintain This Action in Pennsylvania.**

Landmark contends that this action may not be maintained in the United States District Court for the Eastern District of Pennsylvania because Axis is not registered as a foreign business corporation in the Commonwealth.  The argument is meritless because the Pennsylvania Business Corporation Law expressly provides that "[t]ransacting any business in interstate or foreign commerce" shall not constitute doing business in the Commonwealth.  15 Pa. C.S.A. § 4122(a)(9).  Axis' purchases of classroom building modules from a Pennsylvania manufacturer, for shipment across state lines and installation in New York public schools, are clearly and indisputably transactions in interstate commerce.  Accordingly, Axis' ability to enforce its contract in this Court is protected by the United States Constitution.  See, e.g., Allenberg Cotton Co. v. Pittman, 419 U.S. 20, 33 (1974).

It is troubling that counsel for Landmark has failed to bring subsection (a)(9) or relevant federal caselaw to the Court's attention, while urging an unconstitutional dismissal of this action based on other inapplicable subsections of the Pennsylvania BCL.  The 1988 Committee Comment to subsection (a)(9), also omitted in defendants' brief, is instructive:

> A corporation is not "doing business" within the meaning of subsection (a) if it is transacting business in interstate commerce (subsection (a)(9)) or soliciting or obtaining orders that must be accepted outside Pennsylvania before the come contracts (subsection (a)(6)).  ***These limitations reflect the provisions of the United States Constitution that grant to the Untied States Congress exclusive power over interstate commerce, and preclude states from imposing restrictions or conditions upon this commerce.  It is intended that these subsections will be construed in a manner consistent with judicial decisions under the United States Constitution.***  Under these decisions, a foreign corporation is not required to obtain a certificate of authority even though it sells goods within a state if they are shipped to the purchasers in interstate commerce.  A corporation need not obtain a certificate of authority even if it also does work and performs acts within the state incidental to the interstate business, e.g., if it takes or enforces a security interest incidental to these transactions.  Nor is it required to obtain a certificate of authority merely because it sends traveling salesmen or solicitors into a state so long as contracts are not made within the state.  Similarly, an office may be maintained by a corporation in a state without obtaining a certificate of authority if the office's functions relate solely to interstate commerce.
>
> Purchases of goods may of course be in interstate commerce as readily as sales.  ***Thus, the purchase of personal property by a foreign corporation for shipment in interstate commerce out of Pennsylvania does not require the corporation to obtain a certificate of authority.***

15 Pa. C.S.A. § 4122 (1988 Committee Comment) (emphasis supplied).

As noted in the Committee's Comment, the requirement to obtain a certificate of authority shall not be construed inconsistently with federal jurisprudence under the Commerce Clause of the United States Constitution.  These cases uniformly hold that state "door-closing" statutes violate the Commerce Clause if applied to foreign corporations engaged in interstate transactions.  See, e.g., <u>Allenberg Cotton Co. v. Pittman</u>, 419 U.S. 20, 33 (1974) (state cannot refuse to enforce in its courts contracts concerning interstate or foreign commerce); <u>Eli Lilly</u>

Co. v. Sav-On-Drugs, Inc., 366 U.S. 276, 278 (1961) (a state cannot require a foreign corporation to obtain a certificate of authority to do business in the state if its business is wholly interstate); Arab American International Bank v. Epstein, 10 F.3d 168, 173-74 (3d Cir. 1993) (application of state door-closing statute to foreign corporation violates Commerce Clause where foreigner enters state to contribute to or conclude interstate transaction). Grand Bahama Petroleum Co. v. Asiatic Petroleum, 550 F.2d 1320, 1326 (2d Cir. 1977) ("state 'door-closing' statute may not impede a diversity action concerning interstate or foreign commerce").

    Here, the sole factual basis for Landmark's summary judgment motion based on lack of capacity to sue is three transactions for the purchase of goods (i.e., building modules for the Yonkers, Winthrop, and Plainedge Projects) by a foreign corporation (Axis) for shipment in interstate commerce (from Pennsylvania to New York). The Declaration of John Buongiorno (Tab 1 to Axis' Response to Landmark's Motion) establishes that Axis' activity in Pennsylvania was 1) very limited and 2) related to completing these interstate transactions. In other words, there was no localized business conducted by Axis in Pennsylvania independent of the interstate transactions. As the federal cases cited above make unequivocally clear, these are transactions in interstate commerce within the exclusive regulatory ambit of the United States Congress which Pennsylvania may not condition or restrict by imposing the requirement of obtaining a certificate of authority.

    The cases cited by Landmark as contrary authority are completely inapposite. None of them involved the shipment of goods manufactured in Pennsylvania across Pennsylvania state lines, in interstate commerce. Landmark's cite to Hoffman Construction

Co. v. Erwin, 331 Pa. 384, 200 A. 579 (1938), is particularly misleading.  In Erwin, the foreign corporation was performing a landscaping, road grading and road construction contract in Pennsylvania, on the estate of a wealthy Bucks County resident.  Thus, Erwin involved improvements to Pennsylvania real estate, performed entirely locally, by a foreign corporation that was not engaging in the shipment of goods in interstate commerce.

Landmark also advances the argument that 15 Pa. C.S.A. § 4122(a)(10) compels Axis to obtain a certificate of authority.  Subsection (a)(10) merely provides that "[c]onducting an isolated transaction completed within 30 days and not in the course of repeated transactions of like nature" shall not be considered doing business in the Commonwealth.  Subsection (a)(10) does not provide that the converse is true (i.e., that a person failing to comply with subsection (a)(10) must obtain a certificate of authority).  More importantly, subsection (a)(10) clearly does not supersede the safe harbor established under subsection (a)(9) for transactions in interstate commerce.  Any other construction would, of course, violate the Commerce Clause of the United States Constitution.

Accordingly, there is no merit to Landmark's contention that Axis is violating Pennsylvania law by purchasing building modules for delivery and installation on-site at construction sites in New York, and Axis has capacity to maintain this suit against both defendants.[1]

---

[1] Even if the Court were persuaded by Defendants' argument that suit may not be maintained, the appropriate relief would not be dismissal, but rather a stay of this action until such time as Axis could obtain a certificate of authority.  See, e.g., Int'l Inventors, Inc., East v. Burner, 242 Pa. Super 265, 363 A.2d 1262, 1264 (Pa. Super 1976).

### C. Douglas George May Be Held Personally Liable for Fraud.

Count I of Axis's Complaint is against Doug George individually and Landmark, the corporate defendant, for fraud. Complaint ¶¶ 30-38. The Complaint specifically alleges that George "knowingly and intentionally made false representations to Axis" when he executed and delivered Payment Application No. 7 to Axis, as well as the sworn Waivers of Liens contained in Exhibits A, B and D to the Complaint. Id. ¶¶ 31, 33. George's active, personal involvement in the making of these false and fraudulent representations could not be clearer – he has admitted that he executed the false documents. See e.g., D. George Deposition (Dec. 27, 2002) at 131-32, 137, 186-87 (Tab 3). He has further admitted that he was Landmark's project manager for the Plainedge Project, and personally had responsibility for management of Landmark's performance, as well as all documents submitted for the purpose of requesting payment from Axis. Id. at 53, 132-33.

Under Pennsylvania and New York law, an agent of a corporation that personally commits a wrongful act may be liable for the act, even if it is committed on behalf of and for the benefit of the corporation. See Wicks v. Milzoco Builders, Inc., 503 Pa. 614, 470 A.2d 86, 89-90 (1983) ("an officer of a corporation who takes part in the commission of a tort by a corporation is personally liable therefor"). Conversely, it is black letter law that a corporation may be found vicariously liable for its agents' tortious acts committed in the course of their employment of the corporation. Under these principles, Axis has properly pleaded fraud claims against both Douglas George and Landmark.

Although defendants acknowledge the fundamental legal principles, they contend that Count I fails to state a claim against Mr. George individually:

> In this case, Axis alleges only that Douglas George signed payment certifications on behalf of Landmark. There are no allegations that Douglas George knew the applications were false or that he personally intended to deceive and mislead Axis for his personal benefit. These are passive acts of nonfeasance which cannot give rise to individual liability on Mr. George's part for the conduct of Landmark. In the absence of any allegations that Douglas George actively took part in the commission of allegedly tortious conduct by Landmark, Axis cannot state a viable cause of action against Douglas George individually.

Defendants' Memorandum, at 25.

Defendants' argument badly mischaracterizes Axis' allegations of fraud against Douglas George. Axis specifically alleged that the false and fraudulent misrepresentations were made in writing by Mr. George personally (Complaint ¶¶ 31-34 and Exhibits A, B and D); that he made the representations intentionally, knowing that they were false (id., ¶¶ 31, 33); and that he made the misrepresentations with a present interest to deceive Axis, and to induce Axis' reliance. Id. ¶ 35. Incredibly, Landmark also contends that executing and delivering a false certification to induce payment of money under false pretenses constitutes "a passive act of nonfeasance," which cannot provide the basis for a civil fraud action. To the contrary, such conduct constitutes active misfeasance. Indeed, such conduct could support a prosecution under the mail fraud and various other criminal statutes, not to mention the imposition of civil liability for fraud.

> **D.     Landmark and George Are Not Entitled to Summary Judgment on Axis' Fraud Claim.**

Landmark seeks summary judgment on Count I of the Complaint based on the contention that no material issues of fact exist and Axis' fraud claims against Douglas George

and Landmark fail as a matter of law. Landmark's position lacks merit for several independent reasons:

1. The "facts" which supposedly support Defendants' motion consist mainly of unsupported, unverified assertions in Defendants' memorandum of law, which fail to meet the requirements of Fed. R. Civ. P. 56(c).

2. The "facts" in Douglas George's affidavit purporting to establish a fraud defense consist of averments concerning the knowledge of Axis representatives which are outside the affiant's personal knowledge and disputed in any event.

3. The record is replete with specific, written evidence of the fraudulent certifications by Douglas George on behalf of Landmark. George has admitted in deposition that he made the certifications.

Axis' fraud claim against Douglas George and Landmark is plain and simple: For months, Landmark didn't pay its suppliers' bills for work that was performed on the Plainedge Project. Meanwhile, Landmark's vice president, Mr. George, repeatedly lied to Axis in sworn submissions to induce Axis to pay Landmark for the same work. These submissions are the false payment certifications and false waivers of liens attached as Exhibits A, B and D to the Complaint.

As a result of this pattern of conduct, Landmark fraudulently obtained premature payment from Axis which Landmark was not entitled to receive under the parties' contract. Specifically, Landmark represented to Axis that Landmark had paid significant funds to at least three of its subcontractors (Pioneer Window Manufacturing Corporation, Town

Supply, and Rodgers Mechanical), for Plainedge Project work, as a prerequisite to requesting payment from Axis. Landmark's game, which it played skillfully, was to get paid and then withhold payment on its subcontractors, forcing them to compromise.

In November 2001, Landmark took its game to an extreme. Under its contract with Axis, Landmark had agreed to a payment schedule that was predicated upon Landmark's submissions of certifications attesting to level of completion of Landmark's work. See, e.g., Complaint Exh. A (Payment Request No. 00007) The payment schedule provided that $140,000 of the contract price for the John West School would be held back until after the school building modules were delivered to the site in New York, and after Landmark's erection and trim-out work on site was completed. In a blatant repudiation of its contractual duties to deliver the buildings on time, complete the on-site work, and then seek payment, Landmark refused to release the modules for the John West School until Axis agreed to pay $120,000 of the contract balance which was not then due, and agreed to other demands.

Faced with the prospect of defaulting on its prime contract obligations to the Plainedge School District from the threatened delay, Axis had no choice but to submit to Landmark's extortionate tactics. After a meeting on December 7, 2001, the parties entered a letter agreement (the "December 18, 2001 Letter Agreement") (Defendants' Exhibit 8) providing for immediate payment of $120,000 of the Landmark subcontract balance, and further providing that the $117,000 remainder of the Landmark subcontract balance be placed into an escrow account to be released to Landmark pursuant to a prescribed schedule:

> The remaining balance of $117,000.00 on the Plainedge subcontract is to be placed in an interest bearing escrow account no later than Tuesday, December 18, 2001 with Francis X. Clark, Esquire, and John J. Delaney, Esquire as escrow agents, for release to Landmark as follows:

    a.    $40,000.00 upon completion of all contracted work by Landmark on the Schwarting Building.

    b.    $40,000.00 upon completion of all contracted work by Landmark on the John West Building.

    c.    $18,500.00, no later than 30 days after presentation of all remaining close out documents from Landmark on the Schwarting Building, including waivers of liens for the electrical, doors and hardware, and windows, certifying payment in full.

    d.    $18,500.00, no later than 30 days after presentation of all remaining close out documents from Landmark on John West Building, including waivers of liens for electrical, doors and hardware, and windows, certifying payment in full.

Axis only agreed to enter the December 18, 2001 Letter Agreement if Landmark agreed to provide Axis with the Waivers of Liens referred to in paragraph 5 of the Letter Agreement. The Waivers of Liens, dated December 12, 2001 and December 18, 2001, contained Defendant George's certification that all of Landmark's subcontractors had been paid for work performed and labor delivered as of the date of the Waiver of Liens. See J. Buongiorno Declaration ¶ 4; Complaint Exh. D. Landmark/George further represented in the Waivers of Liens that none of its subcontractors had any claim of lien against the Plainedge Project. On December 7, 2001 in negotiations relating to the December 18, 2001 Letter Agreement, defendant Douglas George represented that Landmark had paid all its subcontractors to date, and agreed to provide a Waiver of Liens certifying to that fact. Robert Wilborg, President of Axis, and John Buongiorno attended the December 7, 2001 meeting. Both Wilborg and Buongiorno relied on George's statements and on the Waivers of Liens subsequently provided by George/Landmark pursuant to paragraph 5 of the Letter Agreement on December 12 and 18, 2001. J. Buongiorno Declaration ¶ 13. Had Wilborg or Buongiorno

known that George was falsely representing the status of payments to Landmark's subcontractors, or that the Waivers of Liens he executed and submitted on December 12 and 18, 2001 were false (exposing Axis to possible liens of $362,000), Axis would not have entered into the December 18, 2001 Letter Agreement. Id. ¶ 14.

In fact, George's representations in the Waivers of Liens and in the December 7, 2001 meeting were knowingly false. In fact, Landmark had paid its window supplier, Pioneer Window, nothing as of December 18, 2001. On or about September 4, 2002, Pioneer filed a mechanic's lien against the project and certified that, up to September 2002, Landmark had paid zero dollars of the $102,600 due and owing to Pioneer as of December 3, 2001. J. Buongiorno Declaration ¶ 15 & Exh. "A" thereto. In addition to Pioneer, two other Landmark subcontractors, Town Supply and Rogers Mechanical, had not been paid a total of approximately $260,000 for work performed and materials delivered prior to December 18, 2001. See, e.g., J. Buongiorno Dep. at 137-140 & Exh. Landmark-9 (Tab 2).

Although Landmark eventually paid Rogers Mechanical, it did not pay Pioneer. As a result of Landmark's non-payment, Pioneer refused to complete its work on the Plainedge Project and refused to make adjustments to the windows to correct dangerous conditions. This placed Axis in jeopardy of defaulting on its obligations to its customer, the Plainedge School District. Eventually, Axis was forced to release $97,000 in the escrow account created pursuant to the December 18, 2001 Letter Agreement to pay Pioneer in order to obtain Pioneer's agreement to complete its work on the Plainedge Project windows. It was never the parties' intent that the funds in the escrow account would be used to fund Landmark's payment obligations to Pioneer in contravention of paragraph 8 of the December 18, 2001 Letter

Agreement. J. Buongiorno Declaration ¶ 17. Accordingly, Landmark/George's fraud was directly responsible for the depletion of $97,000 in escrowed funds.

Indeed, Landmark failed to meet the conditions for the payment of the escrowed funds set forth in the Letter Agreement. Landmark never completed its contracted work for either the John West or Charles Schwarting Elementary Schools. As a result, Axis was forced to hire other subcontractors and devote other resources to complete tasks within Landmark's scope of work, at a significant expense to Axis. These expenses exceeded $200,000. J. Buongiorno Declaration ¶ 18.

In essence, as a result of Landmark's fraud, Axis lost its "security" for Landmark's completion of its contracted work on the Plainedge Project. Id. ¶ 19. First, Axis released $120,000 before on-site work on the John West School was completed. Second, Axis was induced to place $117,000 into an escrow account jointly controlled with Landmark. Rather than retain that security as contemplated by paragraph 8 of the Letter Agreement, it became necessary for Axis to use $97,000 of $117,000 placed in escrow for completion of the Plainedge Project to fund Landmark's separate obligations to Pioneer. This has caused harm to Axis because Landmark has never "earned" these disbursements from the escrow accounts in accordance with the terms of paragraph 8 of the December 18, 2001 Letter Agreement. J. Buongiorno Dep. at ¶¶ 19-21.

Additionally, Axis incurred substantial attorneys' fees and surety costs to "bond off" Pioneer's lien, and suffered a substantial delay in payment from Plainedge as a direct result of Landmark's fraudulent failure to pay Pioneer. J. Buongiorno Declaration ¶ 16. In sum, Axis has adduced substantial evidence in discovery from which a factfinder could

reasonably conclude that Landmark/George committed fraud.  While defendants would have the Court ignore their written, certified misrepresentations and believe that their misconduct was "business as usual," all the elements of fraud are present:  material misrepresentations, known to be false, made with intent to induce reliance, justifiable reliance on the misrepresentation, and injury proximately caused by the reliance.

Landmark and George offer a series of convoluted arguments that ignore the plain language of their sworn Waivers of Liens dated December 12 and 18, 2001.  (Complaint Exh. D):

> THE UNDERSIGNED further warrants that (1) all workmen employed by it or its subcontractors upon the Project have been fully paid to the date hereof, (2) all materialmen from whom the undersigned or its subcontractors have purchased materials have been paid for material delivered on or prior to the date hereof, (3) none of such workmen and materialmen has any claim of lien or demand or right of lien against the land and improvements described above, and (4) stipulates that he is an authorized officer with full power to execute this waiver of liens.

Landmark's and George's contention that they made no misrepresentation concerning Pioneer in this sworn statement collides head-on with Pioneer's mechanic's lien and supporting affidavit (Exhibit A to J. Buongiorno Declaration) in which Pioneer certified that all material had been delivered prior to December 3, 2001.  Moreover, nothing in the statement limits it to materials which are 100-percent free of defects or in need of repairs, as Landmark appears to contend.  If Landmark truly believed the windows delivered by Pioneer were valueless, it would not have valued window materials delivered as of November 9, 2001 (a month before the date of the Waiver of Liens) at $68,737.  Nor would Landmark have certified its entitlement to payment from Axis for $68,737 of window work.  See Complaint Exh. A

(Payment Application No. 00007). Thus, Landmark's defense that no payment was "due" to Pioneer is belied by Landmark/George's own certifications to Axis that payment for window work was due.

Landmark's argument that false representations as to $362,000 of subcontractor payments was not material to Axis' decision to enter the December 18, 2001 Letter Agreement is equally meritless. Axis representatives have directly refuted this. J. Buongiorno Declaration ¶ 14; J. Buongiorno Dep. at 152-154. Axis representatives justifiably relied on Landmark's sworn certifications, in writing, that payment had been made. J. Buongiorno Declaration ¶ 13.

Landmark/George also contend that Axis is in no worse position than it would have been had Axis not entered into the December 18, 2001 Letter Agreement. This is incorrect. Axis has, in fact, suffered various categories of harm as a result of Landmark's fraud. First, Axis was defrauded into paying Landmark for window work which Landmark had secretly refused to pass through to its subcontractor. This resulted in Pioneer filing a $102,600 lien against the Plainedge Project. Axis incurred substantial expenses to clear the lien. Payments from Plainedge to Axis were delayed for months. Second, Axis paid $120,000 to Landmark for delivery of the John West Building in reliance on Landmark's misrepresentations. See December 18, 2001 Letter Agreement ¶¶ 3-4. Third, Axis placed the remaining $117,000 contract balance into escrow. That $117,000 was reduced to approximately $20,000, again as a result of Landmark's failure to pay Pioneer from funds Axis had advanced to Landmark for that very purpose.

Thus, Landmark/George's fraud has had a very real pecuniary impact on Axis – by fraudulently obtaining payment from Axis without <u>earning</u> those payments, Landmark deprived Axis of its security for Landmark's completion of its contracted work on the Plainedge Project. As noted above, Axis alleges in Count VI of the Complaint that it incurred backcharges to complete work Landmark refused to complete. These backcharges exceeded $200,000. Since only $20,000 remains in the escrow account, Axis will have to rely on Landmark's credit to collect its recovery, $21,454 of which Landmark has already conceded. <u>See</u> J. Buongiorno Declaration ¶ 22. Moreover, Town Supply has a claim of $17,000 based on its settlement with Landmark, and has notified Axis' surety of its claim against Axis' payment bond.

There is simply inadequate cash in the escrow account remaining to pay everyone. This was a direct result of Landmark/George's fraud. Accordingly, if Axis prevails on its claims for backcharges, but is unable to collect its judgment against Landmark, Axis should be entitled to pursue such uncollected balance as fraud damages against Landmark and George directly.

### III. SUMMARY JUDGMENT ON COUNTS II (BREACH OF ESCROW AGREEMENT); COUNT III (DECLARATORY JUDGMENT); AND COUNT VIII (BREACH OF IMPLIED COVENANT OF GOOD FAITH) IS INAPPROPRIATE

Landmark contends that Axis' supposed failure to adduce evidence that Landmark/George's waivers of liens provided on December 12 and 18, 2001 were false also entitles defendants to summary judgment on Counts II, III and VIII of the Complaint. For all the reasons stated above, Axis has, in fact, adduced adequate evidence that Landmark materially breached the December 18, 2001 Letter Agreement (and the implied covenant of

good faith) by providing absolutely false and fraudulent waivers of liens. Accordingly, summary judgment is not appropriate on these counts.

## IV.  CONCLUSION

For all the foregoing reasons, Axis respectfully requests that Landmark's motion for summary judgment be denied, with the exception of Counts IV, V and VII which may be dismissed as moot, with Axis' consent.

Respectfully submitted,

_____
David R. Moffitt, Esquire
Attorney I.D. No. 47256
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA  19102-2186
(215) 972-7162

*Counsel for Plaintiff*

Dated:

## CERTIFICATE OF SERVICE

I hereby certify that on the _____ day of _____, 2003, I caused a true and correct copy of the foregoing Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment to be served via United States first class mail, postage prepaid, addressed as follow:

>Francis X. Clark, Esquire
>987 Old Eagle School Road
>Suite 705
>Wayne, PA  19087
>
>Edward Seglias, Esquire
>Cohen, Seglias, Pallas, Greenhall
> & Furman, P.C.
>1515 Market Street, 11th Floor
>Philadelphia, PA  19102

_____
David R. Moffitt

720650.1 2/27/03