**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

AXIS CONSTRUCTION CORP.  : CIVIL ACTION
       Plaintiff   :
       v.     :
LANDMARK BUILDING SYSTEMS, :
INC., et al.       : NO. 02-3017
  Defendants/Third Party Plaintiffs :
       v.     :
PIONEER WINDOWS, INC., et al.  :
   Third Party Defendants  :

<u>**PROPOSED PRE-TRIAL FINDINGS OF FACT AND
CONCLUSIONS OF LAW OF DEFENDANT,
LANDMARK BUILDING SYSTEMS, INC.**</u>

Defendant, Landmark Building Systems, Inc. ("Landmark"), by its undersigned

counsel, hereby submits its Proposed Pre-Trial Findings of Fact and Conclusions of Law

in connection with the claims asserted herein by Plaintiff, Axis Construction Corp.

("Axis"), pursuant to this Court's Scheduling Order of November 18, 2002, as follows:

**I.  PROPOSED FINDINGS OF FACT**

1.  Landmark is a Pennsylvania corporation engaged in the manufacture and

sale of modular building units with its offices at Laurel and West Crane Roads, P.O. Box

315, Pottstown, PA 19464.

1

2.     Axis Construction Corp. is a New York corporation operating as a general contracting construction company with offices at 120 Brook Avenue, Deer Park, NY 11729.

3.     On July 17, 2001, Axis awarded Landmark a subcontract to supply modular classroom building units under a contract which Axis entered into with Plainedge Union Free School District ("Plainedge") for construction of new elementary school buildings for the Charles E. Schwarting Elementary School ("Schwarting") and John H. West Elementary School ("West") located on Long Island, New York.

4.     Axis awarded Landmark its subcontract in accordance with Landmark's revised proposal and scope of work dated July 11, 2001 for an initial subcontract price of $1,852,891.00.

5.     Axis and Landmark also negotiated an expedited schedule for delivery of the modular classroom buildings and bi-weekly progress payments for Landmark's fabrication of the modular classroom building units.

6.     Landmark's subcontract for Plainedge was also increased by change orders issued by Axis which brought its total adjusted subcontract price to $1,943,835.56.

7.     Axis had entered into two previous subcontracts to manufacture and furnish modular building units for Yonkers School District, which contract was awarded on January 24, 2000 and for the Winthorp Hospital, which subcontract was awarded in September, 2000.

2

8. Although Landmark's work on those projects had been substantially completed by the time that it was awarded the Plainedge subcontract, Landmark was still owed a balance of $33,000.00 for its work on the Yonkers project and a balance of $85,339.00 for the Winthorp project on which Axis had withheld payment.

9. Landmark also learned that Axis was extremely delinquent in releasing payment of substantial sums in excess of $500,000.00 to subcontractors for other construction projects, which was admitted to Landmark by Axis' principals who had told these other subcontractors to "just get in line" before they could expect to receive payment.

10. In fact, during Landmark's relationship with Axis, Axis had a history of "rolling over" its obligation to issue final payment to Landmark on previous jobs into the sums which were be paid to Landmark for its subsequent projects, such that Axis always maintained an account payable to Landmark in excess of $100,000.00 which Axis always promised to "make up on the next job" which it subcontracted to Landmark.

11. Based upon Axis' tardy payment history and lax attitude towards its delinquent payment obligations, Landmark concluded that there was a substantial risk that Axis never intended to make full payment on its rolling accounts payable obligations to Landmark, particularly if there was no "next job."

12. Since Axis refused to make any commitment as to when it would make payment to Landmark for the previous jobs and would have owed Landmark substantial

3

sums in excess of $200,000.00 on the Plainedge Project once it took delivery of the second set of modular buildings for the West Elementary School, Landmark had reasonable grounds for insecurity for which it demanded adequate assurances of Axis' intention and ability to make payment owed to Landmark for all three projects.

13.     Landmark therefore insisted that Axis agree to release $160,000.00 owed to Landmark and escrow a balance of $150,000.00 to be released upon repairs to some HVAC units for the Yonkers School and as well as Landmark's site work and project closeout on the Plainedge School project.

14.     The parties therefore entered into the Escrow Settlement Agreement dated December 18, 2002 calling for the release of monies owed to Landmark, the delivery of the John West School and the deposit of $150,000.00 by Axis into an escrow account for which Axis' counsel, John DeLaney and Landmark's counsel, Francis X. Clark, were designated escrow agents.

15.     Said Escrow Settlement Agreement made no provision for reduction of the balances to be released to Landmark out of the escrow account for any "backcharges" or work which Axis intended to claim that it had performed on Landmark's behalf.

16.     Furthermore, Axis never gave Landmark any indication that it intended to demand the return of all or some of the funds placed in the escrow account for backcharges or otherwise.

17.    In reality, Axis never intended to comply with the Escrow Settlement Agreement by authorizing the release of final payments owed to Landmark upon performance of its work from the escrow fund, but instead planned to claim that those escrow funds should be returned to Axis as payment for backcharges for work which it was going to claim it performed on Landmark's behalf, much of which was completed prior to December 18, 2001.

18.    Shortly after Landmark was awarded the subcontract by Axis, it entered into purchase order subcontracts with Town Supply Company, Inc. ("Town Supply") of Phoenixville, Pennsylvania to furnish doors, door frames and hardware for the modular classroom building units.

19.    Landmark had also entered into a purchase order subcontract with Pioneer Window Manufacturing Corporation ("Pioneer") of Hicksville, New York, which was an approved manufacturer designated in the contract specifications, to furnish the windows required for construction of the modular classroom buildings.

20.    Unfortunately, both the doors and the windows which were to be furnished by Town Supply and Pioneer were not ready for delivery by the time the first buildings units were shipped for the Schwarting Elementary School.

21.    When Town Supply's doors were delivered to the job site in October, 2001, it was determined that the doors were not compatible with the door frames which had

already been installed in the building units; Axis personnel were aware of this problem at the time.

22.     Furthermore, when the window units were shipped to the Schwarting site in November, 2001, they did not operate properly and required field modifications, which Pioneer authorized Landmark to perform; Axis personnel were also aware of the deficiencies in the windows provided by Pioneer at that time.

23.     In the Escrow Settlement Agreement of December 18, 2001, Landmark was required to provide Axis with "Waivers of Liens (in form satisfactory to Axis) from Landmark's subcontractors . . . for plumbing, HVAC, roofing materials and steel, certifying (either) partial payment (or) payment in full."

24.     Landmark's subcontractors for doors and windows were specifically excluded from those subcontractors for which Landmark was required to provide lien waivers because the parties were aware of the problems with those supplier's materials and that, therefore, Landmark intended to withhold payment from those subcontractors until those problems had been corrected and the total out-of-pocket costs for backcharges to those subcontractors, for both Landmark and Axis, could be ascertained.

25.     In fact, Axis had previously deducted a total of $60,000.00 from Landmark's Payment Application No. 6 dated September 31, 2001 because the windows to be furnished by Pioneer had not been delivered to the site at that time such that Landmark had not been paid for that portion of Pioneer's work.

26.    Furthermore, by December 18, 2001, Landmark had paid Town Supply a total of $67,250.00 on Town Supply's base subcontract price of $77,500.00 and that the balance claimed by Town Supply of $27,260.00 was disputed because the cost for correction of their materials, by both Axis and Landmark, had not been ascertained at that time.

27.    Furthermore, Pioneer had not even invoiced Landmark for windows manufactured for either the Schwarting or West projects until November 26, 2001, which invoices were due "net 30 days."

28.    Therefore, even if those windows had been properly manufactured, which they were not, no sums would have been due from Landmark to Pioneer Windows until after the Escrow Settlement Agreement had already been entered into on December 18, 2001.

29.    Obviously, any amounts owed for Pioneer's windows was very much in dispute since it was unknown whether the windows could be fixed, whether they would be accepted by the owners and how much it would cost either Axis or Landmark to either repair or replace those windows if Pioneer failed to perform under its subcontract with Landmark.

30.    At the time Axis was to make payment owed Landmark under the Escrow Settlement Agreement of December 18, 2002, Landmark was asked to sign a separate

7

payment certification, in addition to the lien waivers to be provided by its subcontractors, certifying that Landmark had paid all sums due to its subcontractors for the project.

31.    Landmark had been asked by Axis to sign such payment certifications at each time it received progress payments for its work on the Plainedge project.

32.    Landmark and its Vice-President, Douglas George, did not make any false representations when it signed the payment certifications in connection with the payments received under the Escrow Settlement Agreement since there were no sums presently due Town Supply or Pioneer, which amounts were certainly in dispute since the cost to correct their deficient materials were unknown.

33.    In fact, at the time the Escrow Settlement Agreement was negotiated, Landmark informed Axis that it had payment disputes with those subcontractors and, as to Pioneer Windows, Axis' response was that "they wouldn't pay them anything either."

34.    Unbeknownst to Landmark, however, Axis intended to use Landmark's payment and workmanship disputes with its subcontractors, including a mechanical subcontractor known as Rogers Mechanical, as a pre-text to claim that Landmark committed "fraud" when it provided those payment certifications in order to obtain payment as required by the Escrow Settlement Agreement, as grounds to void that agreement and demand a refund of the escrow funds as compensation for Axis' undisclosed and unjustified backcharges to Landmark.

35.     Axis therefore filed its present lawsuit against Axis and the escrow agents only one month later on January 18, 2002, seeking to set aside the Escrow Settlement Agreement on the grounds of "fraud", unjust enrichment, breach of contract, etc.

36.     Axis chose, however, not to inform Landmark as to the filing of that suit for its intention to seek to set aside the Escrow Settlement Agreement and never served its original Complaint upon Landmark.

37.     Both Landmark and Axis had ongoing work to complete for the John West School, as well as the corrective work necessary for the windows provided by Pioneer.

38.     At the same time, in order to bolster its effort to void the Escrow Settlement Agreement, Axis sent Landmark repeated, unjustified demands that Landmark made payment on its disputed subcontractors' demands, even though their work had not been corrected and Axis had not even quantified any costs which Axis intended to assess against Landmark to correct the defective subcontractors' materials.

39.     Landmark repeatedly responded to Axis that payment would be made to its subcontractors, as required under Landmark's subcontract with those entities, once their work had been corrected and accepted by the owner of the Plainedge projects.

40.     Pioneer, in particular, refused to take any action whatsoever to correct the deficiencies in its windows, or even to respond to Landmark's demands, which refusals were of course supported by Axis' demands upon Landmark to pay Pioneer even though its windows were not even operable.

9

41.    In the meantime, Axis hired its own subcontractor, known as Champion Windows, to perform corrective work on Pioneer's windows, which work was not authorized or directed by Pioneer itself.

42.    It later turned out that, rather than fixing Pioneer's windows, Champion made the problems even worse, which problems Pioneer had to correct and for which Pioneer was eventually paid additional sums out of the monies owed to Landmark in the escrow account and for which Landmark seeks reimbursement from Axis directly in this proceeding.

43.    Landmark also incurred additional costs of $14,995.00 for crane rental and down time for its employees who were unable to commence work upon delivery of the West modular classroom buildings to the site because Axis had not prepared the site properly as required by its subcontract with Landmark, for which Landmark also seeks compensation directly from Axis in this proceeding.

44.    Although Axis repeatedly indicated that it incurred costs for correcting Town Supply and Pioneer's components, it refused to quantify those expenses or provided Landmark with any back up for the charges until after both buildings were substantially completed.

45.    Axis also began to blame Landmark for costs incurred by Landmark for extras which were ordered by the Owner, which were not required under Landmark's

subcontract, or for work which was Axis' obligations under that subcontract agreement, once again, without providing Landmark with any back up or out-of-pocket costs.

46.    After the West building was substantially completed in May, 2002, Axis refiled its present suit against Landmark and served it with its Complaint, alleging many facts from the original Complaint to set aside the Escrow Settlement Agreement which were either incorrect or were no longer true, such as Landmark's payment of Rogers Mechanical in full.

47.    It was only after Axis served its Complaint in this matter that it finally provided Landmark with a breakdown and back up for its backcharges for which it is claiming compensation either from the escrow fund or directly from Landmark in this proceeding.

48.    After Axis filed its suit, Landmark joined three of its subcontractors as Third Party Defendants who were responsible for the lion's share of actual out-of-pocket costs for which Axis was seeking compensation from Landmark.

49.    Hummer Equipment Co. was the HVAC supplier for the Yonkers School project for which Landmark was to receive $33,000.00 out of the $150,000.00 escrow deposit.

50.    After Landmark's completion of the Yonkers project, a problem developed with the HVAC units which required their replacement for which Hummer was responsible.

51.    Hummer, Axis and Landmark therefore entered into a Settlement Agreement under which Hummer repaired those HVAC units at its own expense and with the assistance of Axis, for which $33,000.00 was disbursed from the escrow funds to Hummer and to Axis, thereby rendering Count II of Axis' Complaint moot.

52.    After lengthy negotiations, Pioneer, Axis and Landmark entered into a Settlement Agreement under which Pioneer was to receive $75,000.00 in settlement of its claim for $102,000.00 on its subcontract with Landmark, to be paid from the escrow funds and credited to the balance due Landmark from Axis.

53.    Pioneer was to receive an additional $22,000.00 for compensation to perform additional corrective work to fix problems with its windows which were created by Axis' subcontractor Champion, which funds were also to be paid to Pioneer from the escrow account and on which both Landmark and Axis have reserved their rights to claim liability for those costs.

54.    Town Supply, Axis and Landmark have also entered into a Joint Stipulation under which Town Supply's demand for an additional $27,260.00 on its subcontract has been reduced to $18,000.00 which funds are also to be paid out of the escrow settlement account to the extent Landmark is entitled to those funds, otherwise Landmark is to make payment to Town Supply of that discounted amount directly.

55.    Landmark and Axis have also entered into an agreement that Axis' backcharges relating to corrective work for Pioneer and Town Supply's materials totals

12

$21,465.00 as a liability from Landmark to Axis which is subject to Landmark's claims for reimbursement for Champion improper window repair work and Landmark's down time on the delivery of the Schwarting buildings.

56.    Axis' remaining backcharges against Landmark either invalid or unsupported by adequate documentation as follows:

**Schwarting School:**

**A.    Electrical Work:**

1)    B/C S-9; HMJ repair for $17,169.00: work done by Axis fired electrical subcontractor prior to Escrow Settlement Agreement included in Axis' general contract for which there is no evidence that Axis made payment;

2)    B/C S-10; Install surge protectors for $3,528.00: owner change to the contract documents which was not included in the original scope of Landmark's subcontract;

3)    B/C S-11; Panel schedules for $298.13: included in Axis' general contract scope;

4)    B/C S-12; Reinstall B/R Sensors for $684.00: owner change in scope not included in Landmark subcontract;

**B.    Windows (Pioneer repair)**

1)    B/C S-13; Install windows for $2,200.00:  repair work done prior to Escrow Settlement Agreement for which there was no notice to Landmark and no documentation provided;

13

2)      B/C S-14; Sheetrock returns for $1,650.00:  repair work done prior to Escrow Settlement Agreement for which there was no notice to Landmark and no documentation provided;

3)      B/C S-15; Corner beads & spackle for $1,760.00:  repair work done prior to Escrow Settlement Agreement for which there was no notice to Landmark and no documentation provided;

4)      B/C S-16; Accessory adjustments for $550.00:  repair work done prior to Escrow Settlement Agreement for which there was no notice to Landmark and no documentation provided;

5)      B/C S-17; Two window units for $900.00: windows to be furnished by Axis under its general contract;

**C.      Flooring**

1)      B/C S-18;  Re-level floors for $7,952.00: flooring work performed prior to Escrow Settlement Agreement included in general contractor's scope of work;

**D.      Carpentry**

1)      B/C S-19; Millwork under sinks for $1,952.00: owner directed change outside scope of Landmark's subcontract;

2)      B/C S-20; Roof coping and ceilings for $1,250.00: general contracting work outside scope of Landmark's subcontract lacking documentation;

3)      B/C S-21; Supply window sills for $4,480.00: general contracting work outside scope of Landmark's subcontract lacking documentation;

4)      B/C S-22; Fire stop corridor for $960.00:  general contracting work outside scope of Landmark's subcontract lacking documentation for work performed prior to Escrow Settlement Agreement;

14

5)   B/C S-23; Roof tie-in for $1,200.00: general contracting work outside scope of Landmark's subcontract lacking documentation for work performed prior to Escrow Settlement Agreement;

6)   B/C S-24; Bathroom saddles & grout for $520.00: general contracting work outside scope of Landmark's subcontract lacking documentation;

7)   B/C S-25; Ceiling repair and leveling grid for $6,731.39: general contracting work performed prior to Escrow Settlement Agreement outside scope of Landmark's subcontract lacking documentation;

8)   B/C S-26; Forklift for LBS materials for $320.08: included in general contractor's scope of work;

9)   B/C S-27; Set RTU's for $1,600.00: included in general contractor's scope of work for work done prior to Escrow Settlement Agreement;

10)  B/C S-28; Change six water closets for $2,900.00: owner directed change not included in scope of Landmark's subcontract;

11)  B/C S-29; Quick ship doors for $3,521.50: change order to Landmark subcontract previously approved by Axis prior to Escrow Settlement Agreement;

## II.  JOHN WEST SCHOOL

### A.  ELECTRICAL

1)   B/C J-4; B & G Electrical work for $21,937.76: corrective work for Axis prior subcontractor HMJ which was fired for which there is no legible documentation to identify work performed;

2)   B/C J-5; RTU switches and clock drop in for $919.60: included in general contractor's scope of work;

3)    B/C J-6; Surge protectors for $4,086.00:  owner change to the contract documents which was not included in the original scope of Landmark's subcontract;

**B.    Windows (Pioneer repairs)**

1)    B/C J-7; Install aluminum breaks for $1,750.00: Defective window repair work performed by Champion;

2)    B/C J-8; Repair windows for $5,550.00:  Defective window repair work performed by Champion;

3)    B/C J-9; Replace five window units for $800.00: included in general contractor's scope of work;

4)    B/C J-10; Provide window and door panels for $1,350.00: included in general contractor's scope of work;

5)    B/C J-11; 21 break metal pieces: defective repair work performed by Champion;

6)    B/C J-20; Adjustment and repairs for $3,500.00:  defective repair work performed by Champion;

7)    B/C J-21; Adjustment and repairs for $4,975.00:  defective repair work performed by Champion;

**C.    Flooring**

1)    B/C J-12; Re-level floors for $5,452.00:  flooring work performed prior to Escrow Settlement Agreement included in general contractor's scope of work;

16

**D.    Carpentry**

    1)    B/C J-13; Provide window sills for $4,500.00:  general contracting work outside scope of Landmark's subcontract lacking documentation;

    2)    B/C J-14; Repair sheetrock walls for $7,253.34: general contracting repair work for damage caused by terrazzo flooring;

    3)    B/C J-15; Millwork for sinks for $1,942.50:  owner directed change outside scope of Landmark's subcontract;

**E.    Miscellaneous**

    1)    B/C J-16; LBS overtime change order for $18,000.00:  change order to Landmark subcontract previously approved by Axis prior to Escrow Settlement Agreement;

    2)    B/C J-18; Trucking delays for $16,755.00: shipment costs included in general contractor's scope of work incurred prior to Escrow Settlement Agreement;

    3)    B/C J-19; Change six water closets for $2,900.00:  owner directed change not included in scope of Landmark's subcontract.

57.    Axis' claims for backcharges are therefore after-the-fact, an attempt to justify its suit to set aside the Escrow Settlement Agreement and deny any payment to Landmark, which was Axis' original intention when it entered into that agreement.

## II.    DEFENDANT'S PROPOSED CONCLUSIONS OF LAW

1.    As Plaintiff, Axis holds the burden of proof as to each and every element of its claims for breach of contract, fraud, declaratory judgment, unjust enrichment and breach of any duty of good faith and fair dealing.

2.    All of Axis' claims against Landmark for damages in this matter arise out of Landmark's obligations to perform its subcontract on the Plainedge Schools project.

3.    Under the "gist of the action" doctrine, Axis may not recharacterize its breach of contract claims as a basis for tort claims for fraud against Landmark and its Vice-President.

4.    Axis was in default of its payment obligations to Landmark in November, 2001.

5.    Landmark had reasonable grounds for insecurity concerning Axis' ability and intention to make payment owed to Landmark for its subcontract work for which it had a right to demand adequate assurances of Axis' performance in the form of the Escrow Settlement Agreement.

6.    Axis had no contractual right to force Landmark to pay its subcontractors who had not performed their work properly.

7.    Axis had no contractual right to condition its obligation to make payment for Landmark's work upon certification of payment to Landmark's subcontractors.

8.    Axis had no contractual right to force Landmark to deliver buildings under its subcontract agreement while it was in material breach with payment obligations to Landmark in November, 2001.

9.    Landmark was not contractually obligated to release payment to its subcontractors who had failed to perform properly under their subcontracts with Landmark as of December, 2001.

10.    Landmark's right to suspend payment to its subcontractors who were in material breach is concomitant with any right claimed by Axis to withhold payment from Landmark for failure to perform, of which there is no evidence in this matter.

11.    Since Landmark's obligations to release payment to its door and window subcontractors was conditioned upon the faithful performance and fulfillment of their contractual obligations, there is no evidence to support Axis' claim that Landmark wrongfully withheld payment from those subcontractors at the time it provided Axis with its payment certifications.

12.    Axis is therefore unable to sustain its burden of proof of fraud, by clear and convincing evidence, that Landmark or its Vice-President made any material misrepresentation of fact at the time it gave Axis its payment certifications.

13.    There is no evidence to support any detrimental reliance by Axis on those payment certifications with regard to payment owed to Landmark's door and window suppliers, since those certifications were not a requirement of the Escrow Settlement

Agreement, which agreement specifically excluded the requirement that Waivers of Liens be provided by Landmark's door and window suppliers.

14.    On the contrary, no waivers of liens from those subcontractors were required under the Escrow Settlement Agreement until final payment was to be made to Landmark upon final closeout of the Schwarting and West Elementary School projects.

15.    Axis therefore cannot sustain its burden of proof of fraud, by clear and convincing evidence, of any detrimental reliance upon those payment certifications at the time it entered into the Escrow Settlement Agreement.

16.    Axis cannot demonstrate that it suffered any financial harm by entering into the Escrow Settlement Agreement which differs from its claims against Landmark for backcharges in breach of contract in this matter.

17.    Axis is therefore unable to sustain its burden of proof of fraud, by clear and convincing evidence, that it suffered any damages as a result of any misrepresentation made by Landmark or its Vice-President.

18.    Axis' argument that the escrow settlement fund was created to protect its right to assess "backcharges" against Landmark is inconsistent with the terms of that agreement and, therefore, is barred by the parole evidence rule.

19.    Axis was on notice that Landmark's door and window suppliers had not performed their subcontracts, and therefore were not entitled to be paid, prior to its entry

into the Escrow Settlement Agreement such that its claims are barred by the doctrines of waiver and estoppel.

20.    Axis failed to give notice or reserve any right to assess Landmark for any backcharges prior to its entry into the Escrow Settlement Agreement.

21.    Its claims for work it says it performed prior to the Escrow Settlement Agreement are therefore barred by the terms of that agreement and the doctrines of waiver and estoppel.

22.    All disbursements from the escrow settlement fund have been made with Axis' express consent such that its claims are barred by the doctrines of accord and satisfaction.

23.    Since Axis failed to disclose its intention to assess backcharges against Landmark after it entered into the Escrow Settlement Agreement, and therefore never intended to comply with the terms thereof, Axis lacks clean hands for which it should be denied any recovery against Landmark in this proceeding.

24.    Landmark is entitled to payment in full for its work on the Plainedge project under the doctrine of substantial performance.

25.    Axis has been paid in full for its work on the Winthorp project such that it has incurred no damages on that project which relate to close out documentation it has demanded from Landmark.

26.     Landmark is entitled to offsets against any claims by Axis for the

$22,000.00 paid to Pioneer to correct defective work by Axis' subcontractor and for

$14,995.00 for labor and equipment down time which resulted from Axis' failure to

prepare the John West job site for delivery of Axis' buildings.

27.     Axis is unable to sustain the burden of proof for any breach of contract

against Landmark for which it has claimed backcharges which was within Axis' general

contract, excluded from Landmark's subcontract, which resulted from changes made by

the owner or for which Axis is lacking documentation or proof of payment.

Respectfully submitted,

FRANCIS X. CLARK, P.C.

DATE:

By:_____
     Francis X. Clark

Attorneys for Defendant,
Landmark Building Systems, Inc.

## CERTIFICATE OF SERVICE

      I, Francis X. Clark, hereby certify that I have served a true and correct copy of the

foregoing Motion for Sanctions to Preclude Evidence of Plaintiff's Claims for

Backcharges at Trial which has been filed electronically with the Court and is available

for viewing and downloading from the ECF system, upon counsel of record this date,

by hand delivery, addressed as follows:

|  |  |
|---|---|
|  | Edward Seglias, Esquire |
| David R. Moffitt, Esquire | Rene D. Quinlan, Esquire |
| SAUL EWING, LLP | COHEN, SEGLIAS, PALLAS, |
| Centre Square West, 38th Floor |   GREENHALL, FURMAN, P.C. |
| 1500 Market Street | 1515 Market Street |
| Philadelphia, PA 19102 | P.O. Box 59449 |
|  | Philadelphia, PA 19102 |

DATE:                                _____

                                       Francis X. Clark